**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| ALISON HOVANEC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No.  SA-17-CV-766-XR |
| | § | |
| TRACI MILLER and | § | |
| MOISES LUEVANO, | § | |
| | § | |
| *Defendants.* | § | |

**ORDER**

On this date, the Court considered the Motion to Dismiss filed by Defendant Traci Miller (docket no. 9) and the Motion to Dismiss filed by Defendant Moises Luevano (docket no. 7), and the responses and replies thereto.

**Background**

Plaintiff Alison Hovanec sues Traci Miller and her ex-husband Moises Luevano for violation of the Stored Communications Act ("SCA"), 18 U.S.C. § 2701 *et seq.*, violation of the Federal Wiretap Act ("FWA"), 18 U.S.C. § 2511 *et seq.*, violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.*, violation of the Texas Criminal Wiretap Act, conspiracy to violate those acts, intrusion on seclusion, intentional infliction of emotional distress (against Miller only), and breach of fiduciary duty (against Luevano only).  Because Miller's motion to dismiss is filed under Rule 12(b)(6), the Court presumes the facts alleged in the Amended Complaint to be true.  Therein, Plaintiff alleges the following:

Alison Hovanec was married to Moises Luevano on August 31, 2002 and reached a mediated settlement in their divorce on May 14, 2015. During the marriage, they were friends with their neighbor Traci Miller, and from May 2013 to May 2015, Miller worked under Hovanec as a wardrobe consultant/sales person for two companies, Carlisle Etcetera LLC and W by Worth. From May 2015 to spring 2016, the relationship between Hovanec and Miller turned from friendly to somewhat antagonistic. Miller would complain about Hovanec to other wardrobe sales consultants and upper management at Carlisle Etcetera LLC and W by Worth, leading to her termination as the local Director of Business Development for W by Worth in May 2015. In the spring of 2016, Miller encouraged her minor daughter to refrain from socializing with Hovanec's daughter on a few occasions.

On May 16, 2016 at 12:05 p.m., Hovanec received an email from "Alison Hovanec" from the email address alisontheloser@gmail.com that referred to her as "such as sucker." Hovanec's mother also received an email from that address entitled, "Your Daughter is dating a married man!" and making disparaging remarks about her, including that she was a loser who was in a "downward spiral" and was not competent or able "to keep a job for more than a few months." Miller also viewed Hovanec's LinkedIn profile on May 16. That same day, Miller called Carlisle Etcetera to complain about the return of a blouse she purchased from Plaintiff six months earlier. Also that day, Luevano informed Hovanec that Miller had asked to meet with him to allegedly discuss the well-being of Hovanec.

Hovanec suspected it was Miller who had sent the emails, so she sent an email under the name Roslyn James and the email address roslynjames1954@gmail.com to alisontheloser@gmail.com at 2:21 p.m. to obtain the IP address of the user through a Stat

Counter linked to the email. The user of alisontheloser@gmail.com responded and clicked a website link that allowed Hovanec to identify the user as an AT&T U-Verse user with a Mac computer in the vicinity of Hovanec's house at the IP address 108.65.34.232.

On May 17, in order to obtain Miller's IP address to see if it matched, Hovanec forwarded an email from her true Gmail address to Miller's Gmail address. The email required Miller to click a link to a website to see the forwarded email so that Hovanec could view Miller's IP address, which was identified as 108.65.34.232. Miller clicked on the link twelve times from 12:06 p.m. to 3:33 p.m., and all revealed the same IP address.

On May 17, 2016 at 3:38 p.m., Hovanec sent another email to Miller that included a preservation of records letter from her attorney. Three minutes later, Hovanec texted Luevano and asked him to call her because Miller "had done something" that Hovanec felt they needed to discuss, but Luevano was dismissive and did not inquire about what Hovanec wanted to discuss or what Miller had done. On May 18, Hovanec determined that Luevano was dismissive because he was already aware of what Miller was doing.

On May 18, Hovanec made a routine review of her AOL email account, which she had used since 2001, and discovered that all of her 9,780 emails had been deleted. Many of these emails contained confidential attorney-client communications concerning the divorce proceedings. Although Hovanec and Luevano had reached a Mediated Settlement Agreement on May 14, 2015, they still had not entered a final decree of divorce in May 2016. Hovanec contacted AOL and was informed that Luevano was the primary account holder and she was only a sub-accountholder. Hovanec then sought and obtained records regarding activity on the account and found that Luevano had accessed the account at 5:53 p.m. (after he had deleted

the emails) to surreptitiously override the password changes that Hovanec made immediately after she learned that the emails had been deleted so that he could keep her out of her own email account. Hovanec was shocked to learn that Luevano had always possessed the ability to access and make use of her personal and confidential emails as he pleased, and realized that he had been accessing her emails throughout their marriage and during the pendency off their divorce to obtain information.

In the following months, Hovanec spent a considerable amount of time determining the damage that had been done, including reorganizing her deleted emails and incurring legal expenses in connection with "the computer breach." In this process, on October 13, 2016, she accessed an old iCloud account to recover some personal emails and photographs that had been placed in her iCloud through her iPhone. In September 2015, Hovanec had terminated use of her iPhone and iCloud because she felt that her information may have been compromised and that Luevano could track her whereabouts. Because she could not recall her password, she contacted Apple and was emailed a link to reset her password and gain access to the iCloud account that she had not accessed for approximately thirteen months.

Upon opening her iCloud using her old Apple ID email address [aliluevano@me.com](mailto:aliluevano@me.com), Hovanec discovered an email to that address from Google at 10:52 a.m. on May 16 stating that there was a request to add [aliluevano@me.com](mailto:aliluevano@me.com) email to "your Google account." Another email was sent to that address stating that the [alisontheloser@gmail.com](mailto:alisontheloser@gmail.com) account had been created at 10:53 a.m. The first email required the user to click a link to "verify" the request to add [aliluevano@me.com](mailto:aliluevano@me.com) to the Google account. Plaintiff alleges that Miller accessed her [aliluevano@me.com](mailto:aliluevano@me.com) email account to click the link to verify the addition of

4

aliluevano@me.com to the alisontheloser@gmail.com account. Another email was sent to the aliluevano@me.com address on May 17 at 4:28 stating that the Google account alisontheloser@gmail.com was deleted, and "[y]ou received this message because aliluevano@me.com is listed as the recovery email for alisontheloser@gmail.com." Plaintiff contends that this shows that Miller clicked on the link in the email to verify the addition of aliluevano@me.com to the alisontheloser Gmail account.

Based on these factual allegations, Hovanec brings claims against Miller and Luevano for violations of the Stored Communications Act, the Federal and Texas Wiretap Acts, the Computer Fraud and Abuse Act, conspiracy, and common-law torts under Texas law.

The Electronic Communications Privacy Act of 1986 included two pieces of legislation relating to electronic communications[1] – it amended existing wiretap laws in 18 U.S.C. § 2501 *et seq.* to prohibit interception of electronic communications and it introduced the Stored Communications Act ("SCA"), 18 U.S.C. § 2701 *et seq.* to address wrongful access to stored electronic communications. Both are criminal statutes that include civil remedies. As discussed by the Fifth Circuit,

> The Wiretap Act proscribes "intentionally intercept[ing] any electronic communications." *DIRECTV, Inc. v. Bennett*, 470 F.3d 565, 566–67 (5th Cir. 2006); 18 U.S.C. §§ 2511(1); 2520(a). Similarly, the Computer Fraud and Abuse Act prohibits certain intentional or knowing access to a computer without authorization. *See* 18 U.S.C. § 1030(a)(4)–(5); *United States v. Phillips*, 477 F.3d 215, 220–21 (5th Cir. 2007) (rejecting defendant's argument that the government presented insufficient evidence to "find him guilty of

---

[1] An "electronic communication" refers to "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce, but does not include (A) any wire or oral communication; (B) any communication made through a tone-only paging device; (C) any communication from a tracking device (as defined in 18 U.S.C.A. § 3117); or (D) electronic funds transfer information stored by a financial institution in a communications system used for the electronic storage and transfer of funds. 18 U.S.C. § 2510(12). Emails are considered electronic communications. *Healix Infusion Therapy, Inc. v. Helix Health, LLC*, 747 F. Supp. 2d 730, 743 (S.D. Tex. 2010).

5

intentional unauthorized access" under § 1030). Finally, the Stored Communications Act requires that a defendant "intentionally access[ ] without authorization" or "intentionally exceed[ ] an authorization to access" a facility that provides electronic communication service. 18 U.S.C. § 2701(a)(1)–(2); *Steve Jackson Games, Inc. v. U.S. Secret Serv.*, 36 F.3d 457, 459 (5th Cir. 1994) (recognizing that 18 U.S.C. § 2701 prohibits "intentional access, without authorization, to stored electronic communications").

*Larson v. Hyperion Int'l Tech., LLC*, 494 F. App'x 493 (5th Cir. 2012).

Plaintiff filed her Original Complaint on August 14, 2017, which did not include a claim under the SCA. Defendant Luevano filed a motion to dismiss, arguing that all the claims against him must be dismissed and submitted to arbitration. Defendant Miller filed a motion to dismiss all the claims against her for failure to state a claim under Rule 12(b)(6). Plaintiff then filed an Amended Complaint as of right, adding the claim under the SCA[2] (and a related conspiracy claim). Plaintiff also filed a Response to the motion to dismiss, and Miller filed a reply.

### Traci Miller's Motion to Dismiss

Traci Miller moves to dismiss all claims (except the SCA claim, which was added in the Amended Complaint) against her for failure to state a claim upon which relief can be granted.[3] To the extent Miller has attached exhibits to her motion, the Court disregards them because Rule 12(b)(6) review is confined to the pleadings.

---

[2] The SCA "regulates the intentional access of stored electronic communications and records." *Borninski v. Williamson*, No. 3:02-CV-1014-L, 2005 WL 1206872, at *11 (N.D. Tex. May 17, 2005). Under the SCA, whoever: (1) "intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished...." 18 U.S.C. § 2701(a)(1); *see also Garcia v. City of Laredo, Tex.*, 702 F.3d 788, 790 (5th Cir. 2012) (stating that the SCA "prohibits accessing without authorization a facility through which an electronic communication service is provided and thereby obtaining access to an electronic communication while it is in electronic storage").

[3] In her Reply, Miller states that "the Court should dismiss all of Plaintiff's claims against Traci Miller," but that is not sufficient to include the newly added claim in the Amended Complaint to her motion to dismiss.

**Federal Wiretap Act and Texas Criminal Wiretap Act**

The Federal Wiretap Act generally prohibits the interception of wire, oral, or electronic communications and provides a civil cause of action for "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter."  18 U.S.C. §§ 2511, 2520.  Miller contends that neither the action of setting up an email account such as the alisontheloser@gmail.com account nor accessing stored communications on a terminated iCloud storage account are violations of the Federal Wiretap Act or the Texas Criminal Wiretap Act, and moves to dismiss these claims because Plaintiff does not allege that Miller captured data communications during transmission or "in flight" and thus there was no contemporaneous interception of any electronic communication.

The FWA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). In *Steve Jackson Games*, the Fifth Circuit held that "the definition of 'electronic communication' does not include electronic storage of such communication" and that Congress did not intend for "intercept" to apply to "electronic communications" when those communications are in "electronic storage." *Steve Jackson Games, Inc. v. U.S. Secret Service*, 36 F.3d 457, 461 (5th Cir. 1994).  The Court rejected the argument that a government agent's acquiring an email prior to its delivery and preventing that delivery (by reading and deleting undelivered emails in a bulletin board system that offered the ability to send and receive private email) were intercepted for purposes of the FWA. Rather, the unread emails in the bulletin board system were in "electronic storage." *Id.* Once an email is received at the email address, it is stored and is no longer in transit, even if it has

not been read. *Id.*; *Speer v. Saenz*, No. H-13-1538, 2015 WL 12551069 (S.D. Tex. Feb. 19, 2015). Thus, access to that content is not an interception. *Id.*[4]

The FWA's definitions of "electronic communication" and "intercept" are virtually identical to the Texas statute's definitions of those terms, such that Texas courts may look to the cases interpreting the FWA for direction. *Chavis v. State*, No. 08-10-00026-CR, 2011 WL 3807747, at *5 (Tex. App.–El Paso, Aug. 26, 2011, pet. ref'd). "Texas courts have held that because of the similarity between the statutes, it is appropriate to follow the guidance of courts interpreting the FWA." *Speer v. Saenz*, 2015 WL 12551069 (S.D. Tex. Feb. 19, 2015) (citing *Castillo v. State*, 810 S.W.2d 180, 183 (Tex. Crim. App. 1990)).

Hovanec alleges that "[t]he actions of MILLER violate the FWA [and the Texas Criminal Act] because she willfully intercepted HOVANEC'S electronic communications when she illegally accessed her iCloud where all of her electronic communications are stored" and "further violated the FWA when she intentionally made use of and disclosed information she obtained by means of her interception of HOVANEC'S electronic communications to HOVANEC'S mother, employer, and other as yet unidentified individuals." Am. Compl. para. 27 & 29. However, as discussed above, accessing emails in the iCloud account, even if unread, is not interception under the FWA or the Texas Act, and thus these counts are dismissed as to Miller.

**Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.***

Hovanec alleges that "MILLER violated the CFAA when she obtained HOVANEC'S iCloud password and then accessed her iCloud information where all of HOVANEC'S

---

[4] Some courts have held that auto-forwarding may satisfy the contemporaneousness requirement, but there is no allegation of email forwarding in this case. *See United States v. Szymuszkiewicz*, 622 F.3d 701 (7th Cir. 2010); *Zaratzian v. Abadir*, No. 10CV9049(VB), 2014 WL 4467919 (S.D.N.Y. Sept. 2, 2014).

personal information including emails, text messages, contacts, photographs, financial and personal health information were stored" and "further violated the CFAA when she created the email address alisontheloser@gmail.com and used information from HOVANEC'S iCloud in emails she sent to HOVANEC, HOVANEC'S mother and to other yet unknown individuals." Am. Compl. para. 32. Hovanec further alleges that "MILLER intended to defraud HOVANEC and did so by making use of information obtained from HOVANEC'S iCloud to make unfounded complaints against her to her employer, Carlisle Etcetera, LLC." *Id.*

The Computer Fraud and Abuse Act ("CFAA") prohibits certain intentional or knowing access to a protected computer without authorization. 18 U.S.C. § 1030; *Larson v. Hyperion Intern. Technologies, LLC*, No. 12–50102, 494 F. App'x 493, 497 (5th Cir. 2012). The statute provides a civil remedy for any person who suffers damage or loss resulting from such a violation. 18 U.S.C.A. § 1030(g); *Fiber Systems Intern., Inc. v. Roehrs*, 470 F.3d 1150, 1156 (5th Cir. 2006).

Hovanec alleges a violation of § 1030(a)(4). To prove that violation, she must establish that Miller: (1) knowingly and with the intent to defraud (2) accessed a "protected computer"[5] (3) without authorization or exceeding such authorization that was granted and (4) furthered the intended fraud and obtained anything of value, (5) causing a loss to one or more persons during any one-year period aggregating at least $5,000 in value. *Estes Forwarding Worldwide LLC v. Cuellar*, 239 F. Supp. 3d 918, 923 (E.D. Va. 2017); *Associated Pump & Supply Co.,*

---

[5] "Computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device. 18 U.S.C. § 1030(e)(1). "Protected computer means a computer used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States. 18 U.S.C. § 1030(e)(2)(B).

*LLC v. Dupre*, No. 14–9, 2014 WL 1330196, at *5 (E.D. La. April 3, 2014). Although it is unclear, Hovanec may also be alleging a violation of § 1030(a)(2)(C). To establish that violation, Plaintiff must show that Miller (1) intentionally accessed a computer, (2) without authorization (or exceeding authorized access), (3) obtained information from a protected computer, and (4) caused at least $5000 in loss. *See Stirling Int'l Realty v. Soderstrom*, No. 6:14-cv-1109-Orl-40TBS, 2015 WL 2354803, at *1 (M.D. Fla. May 15, 2015).

A civil action can only be maintained under § 1030 of the CFAA "if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." 18 U.S.C. § 1030(g). The only relevant factor in this case is in subclause (I), which includes "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I). Miller contends that Plaintiff has not established a cause of action under the CFAA because creation of the Gmail account is not a violation of the CFAA and because, in relation to the iCloud account, she cannot show an aggregate loss in excess of $5,000.

In her Amended Complaint, Hovanec alleges that she has "spent several hours a week since May 16, 2017[6] trying to assess the damage caused by MILLER's access to her iCloud and LUEVANO's extensive access to her AOL account" and that she "is entitled to recover damages for the time she spent investigating and remedying the violations of the CFAA committed by MILLER and LUEVANO." Am. Compl. para. 34. Hovanec contends that, based on her education and employment history, she is entitled to be compensated at a rate of at least $25 per hour "for every hour she was forced to spend to respond to and remedy the CFAA violations committed against her by MILLER and LUEVANO" and thus far she has

---

[6] This date may be a typo.

spent approximately 580 hours, which entitles her to a recovery of $14,500. Hovanec further alleges that she is "entitled to recover the income/revenue that she lost as a result of the use by MILLER of information she accessed from her iCloud that led to HOVANEC's termination from W by Worth" and the cost of employing two experts "to evaluate and respond to the violations of the CFAA committed by MILLER" as well as attorneys' fees, which thus far are in excess of $50,000. Am. Compl. para. 34. Hovanec contends that this is sufficient to show at least a $5000 loss. Docket no. 12 at 5.

The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Some courts have construed the definition of "loss" to include only the two subtypes of loss set forth in the CFAA: (1) costs incurred due to investigating, responding to, and correcting damage caused by a violation, and (2) costs incurred, revenue lost, or other damages resulting from an interruption of service. *Stirling Int'l Realty, Inc. v. Soderstrom*, No. 6:14-CV-1109-Orl-40TBS, 2015 WL 2354803 (M.D. Fla. May 15, 2015); *Talon Transaction Tech. v. Stoneeagle Servs.*, No. 3:13-cv-00902-P, 2013 WL 12172926, at *3 (N.D. Tex. Aug. 15, 2013) ("To clarify the concept of loss, the term 'encompasses only two types of harm: costs to investigate and respond to an offense, and costs incurred because of a service interruption.'"); *Alliantgroup, L.P. v. Feingold*, 803 F. Supp. 2d 610, 630 (S.D. Tex. 2011) ("The term 'loss' encompasses only two types of harm: costs to investigate and respond to an offense, and costs incurred because of a service interruption."). Other courts, however,

have noted that a statute's use of "including" is illustrative rather than exhaustive, such that "any reasonable cost" may include costs not expressly delineated in the statute. *E.g.*, *Motio, Inc. v. BSP Software LLC*, No. 3:16-cv-00331-O, 2016 WL 9559916, at *15 (N.D. Tex. May 27, 2016) ("[T]he Court declines to follow *Alliantgroup* and *Quantlab*, as they interpret the phrase 'reasonable cost to any victim, including the cost . . .' as strictly limiting the 'cost' to the list of terms following 'including.'").

In this case, though Plaintiff alleges at least some losses that fall within the scope of the CFAA, such as costs to investigate an offense, she does not adequately distinguish between the loss due to Miller's alleged CFAA violation from the loss due to Luevano's alleged CFAA violation. Her Amended Complaint addresses these losses together in a section called "Damages Under the Computer Fraud and Abuse Act ('CFAA') From Both Defendants." Am. Compl. at 20. She claims 580 hours spent responding to and remedying the CFAA violations, but fails to differentiate between time spent addressing Miller's alleged access to her iCloud account and Luevano's alleged access to (over many years) and deletion of emails in her AOL account. Similarly, she does not differentiate costs for her experts or her attorney's fees (assuming these count as losses). According to Hovanec's Complaint, she did not even discover Miller's alleged access to the iCloud account until October 13, 2016, five months after she discovered the issues with her AOL emails. Thus, the losses cannot be aggregated.

In addition, Plaintiff is claiming her lost income related to her termination from W by Worth. Plaintiff alleges that Miller violated the CFAA "when she obtained HOVANEC'S iCloud password and then accessed her iCloud information where all of HOVANEC'S

personal information including emails, text messages, contacts, photographs, financial and personal health information were stored," that she intended to "defraud HOVANEC and did so by making use of information obtained from HOVANEC'S iCloud to make unfounded complaints against her to her employer, Carlisle Etcetera, LLC," and that "[t]hose unfounded allegations regarding HOVANEC'S job performance ultimately resulted in HOVANEC'S termination from W by Worth in May 2015." Plaintiff fails to quantify this alleged lost income and thus fails to demonstrate that it exceeds $5,000. In addition, she fails to allege that Miller accessed her iCloud account prior to May 2015, when Hovanec was terminated from W by Worth.[7]

Miller's motion to dismiss the CFAA claim is granted, but with leave to replead to distinguish losses resulting from Miller's alleged violation from Luevano's alleged violation to attempt to establish that Hovanec suffered a loss over $5000 related to Miller's alleged violation.

**Conspiracy claims (FWA, TCWA, SCA, and CFAA)**

Miller contends that the elements of civil conspiracy are those set forth in the Texas Supreme Court case *Insurance Company of North America v. Morris*, 981 S.W.2d 667, 675 (Tex. 1998) and include: (1) a combination of two or more persons; (2) an object to be

---

[7] The Court notes that Plaintiff's timeline and allegations concerning Miller's alleged access to her iCloud and its effects on Plaintiff's employment are a bit confusing. She alleges that Miller accessed her iCloud account in May **2016** to verify the use of aliluevano@me.com as a linked email to the alisontheloser Gmail account and that same day made a complaint to Carlisle Etcetera about the return of a blouse she purchased from Plaintiff six months earlier. Am. Compl. para. 24 & 32. However, Plaintiff does not specify any information obtained from her iCloud account that was used to make unfounded complaints about her to Carlisle Etcetera. Further, she complains that Miller's use of information from the iCloud account to make unfounded allegations regarding Hovanec's job performance ultimately resulted in Hovanec's termination from W by Worth in May **2015**. Thus, when repleading, Plaintiff should clarify when she alleges that Miller accessed her iCloud account (if other than May 2016), what information she obtained when accessing the account, and how that information was used and/or affected her employment with either Carlisle Etcetera or W by Worth. In addition, when repleading, Plaintiff should specify the exact sections of the CFAA under which she is asserting claims (*e.g.*, § 1030(a)(2)(C), § 1030(A)(4)).

accomplished (an unlawful purpose or a lawful purpose by unlawful means); (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. Docket no. 9 at 7. Miller moves to dismiss the conspiracy claims on the basis that Miller "fails to identify the unlawful purpose or lawful purpose by unlawful means and that either her former spouse, Luevano, or Traci Miller had a meeting of the minds." Docket no. 9 at 8. Hovanec responds that she is "only required to allege that one member of the alleged conspiracy committed an unlawful overt act," and that she has alleged "numerous overt acts." Docket no. 12 at 5.

Plaintiff does not specify the law under which she asserts her conspiracy claim, though it appears that she is basing the claim on Texas common law because she cites *Operation Rescue-National v. Planned Parenthood of Houston and Southeast Texas, Inc.*, 975 S.W.2d 546, 553 (Tex. 1998). Docket no. 12 at 5. Under Texas law, conspiracy is a derivative tort, so a plaintiff must state a separate underlying claim on which the court may grant relief or the conspiracy claim fails. *DHI Group, Inc. v. Kent*, No. H-16-1670, 2017 WL 1088352 (S.D. Tex. Mar. 3, 2017) (citing *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 640 (5th Cir. 2007)). Plaintiff's Amended Complaint alleges a conspiracy to violate the FWA, TCWA, CFAA, and SCA.

Plaintiff fails to allege any conspiracy to "intercept" as defined by the FWA or the Texas Wiretap Act, and thus those statutes cannot form the basis of a conspiracy claim. The CFAA makes it a crime to conspire to commit an offense under subsection (a) of § 1030, and § 1030(g) creates a private right of action for such a violation. Thus, the elements of conspiracy under § 1030(b) and federal law would seem to be the appropriate elements for this claim

rather than Texas civil conspiracy law. In fact, the Southern District of Texas has held that, by creating a statutory conspiracy claim, Congress excluded common-law conspiracy claims. *DHI Group, Inc. v. Kent*, No. H-16-1670, 2017 WL 1088352, at * 12 (S.D. Tex. Mar. 3, 2017).[8] Title 18 U.S.C. § 371 makes it a crime to conspire to commit an offense against the laws of the United States. The elements of such an unlawful conspiracy include: (1) that the defendant and at least one other person made an agreement to commit the crime; (2) that the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and (3) for certain crimes, that one of the conspirators during the existence of the conspiracy knowingly committed at least one overt act in order to accomplish some object or purpose of the conspiracy.

Under either Texas or federal law, it not sufficient for Plaintiff to simply allege overt acts. There must be a meeting of the minds in the sense that the parties agreed to commit the crime at issue. *See Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996) (merely proving joint intent to engage in conduct that resulted in injury not sufficient; civil conspiracy requires specific intent to agree to accomplish unlawful purpose or to accomplish lawful purpose by unlawful means); *Hey v. Irving*, 161 F.3d 7 (5th Cir. 1998) (to establish a cause of action based on conspiracy a plaintiff must show that the defendants agreed to commit an illegal act").

---

[8] That same court, along with others, has held that there is no state-law conspiracy cause of action for violations of the SCA because it contains no conspiracy crime, § 2707 constrains civil liability to "violations of this chapter," and § 2708 states that "[t]he remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter." *DHI Group*, 2017 WL 1088352, at *12; *see also Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*, 891 F. Supp. 2d 13, 26-27 (D.D.C. 2012); *Vista Marketing, LLC v. Burkett*, 999 F. Supp. 2d 1294, 1297 (M.D. Fla. 2014); *Jones v. Global Information Groups, Inc.*, No. 3:06-00246-JDM, 2009 WL 799745, at *3 (W.D. Ky. Mar. 25, 2009). As noted, the SCA and conspiracy to violate the SCA claims were added after Miller filed her motion to dismiss, and thus are not challenged by Miller at this time. Nevertheless, to the extent a conspiracy to violate the SCA claim is legally cognizable, it is subject to the same argument (lack of allegation as to agreement to commit the crime) as the other conspiracy claims.

Plaintiff's Amended Complaint fails to allege sufficient facts to make a plausible claim that Luevano and Miller conspired to violate the CFAA. The Amended Complaint alleges that they made "a coordinated effort" to commit computer fraud and "make use of electronic communications in connection with the unlawful access to the computer and iCloud of the Plaintiff." She alleges that, during the marriage, she and Luevano were friends with Miller and that their children attended the same school and were friends. Plaintiff alleges that, after she sent Miller the preservation letter, she texted Luevano and asked him to call her because Miller "had done something" (sending the alisontheloser@gmail.com emails) they needed to discuss, but Luevano was "surprisingly dismissive" and it was "strange that Luevano made no inquiry whatsoever as to what Miller may have done and whether or not her action(s) could be harmful to his children." Plaintiff alleges that she later "discovered that Luevano was dismissive about what Miller may have done because he was already aware that Miller had been illegally accessing Hovanec's computer[9] and intercepting her electronic data." Plaintiff alleges that she discovered this when she accessed her AOL account on May 18 and discovered that Luevano had deleted her emails, that Luevano was the primary account holder on the AOL email account, and that Luevano had accessed the account after Hovanec discovered the deletion and that he changed the password "to keep her out of her own email account." Plaintiff contends that "Luevano's impulsive decision to delete all of Hovanec's emails just one day after Miller received her preservation letter revealed that Miller and Luevano had discussed the fact that Miller had been caught sending the fictitious alisontheloser@gmail.com emails to Hovanec."

---

[9] Plaintiff's Amended Complaint makes references to Miller accessing Plaintiff's computer, but the facts do not support this allegation. Rather, the facts alleged are that Miller accessed Plaintiff's iCloud account, which is not stored on Plaintiff's computer.

Notably absent from these allegations is any assertion that Miller and Luevano reached any meeting of the minds or agreement for either of them to violate the CFAA. At most, it alleges that Luevano was aware that Miller had accessed Plaintiff's iCloud account and had sent the [alisontheloser@gmail.com](mailto:alisontheloser@gmail.com) emails. Further, there is no allegation that Miller conspired with Luevano for him to access or delete Plaintiff's AOL account emails. The allegations are insufficient to establish a conspiracy. Miller's motion to dismiss the conspiracy claim is granted.

**Intrusion on Seclusion**

Hovanec alleges that "MILLER intentionally intruded upon the privacy of HOVANEC when MILLER accessed HOVANEC's iCloud that contained all of HOVANEC'S personal information including emails, text messages, contacts, photographs, financial and personal health information. MILLER also intruded upon the privacy of HOVANEC when she caused the phony and insulting emails using alisontheloser@gmail.com to be sent to HOVANEC and to her mother." Am. Compl. para. 36.

The elements of a cause of action for invasion of privacy by intrusion on seclusion are: (1) the defendant intentionally intruded on the plaintiff's solitude, seclusion, or private affairs; and (2) the intrusion would be highly offensive to a reasonable person. *Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex. 1993). Miller moves to dismiss this claim on the basis that such claims are generally limited to physical intrusion and/or eavesdropping with the aid of a wiretap, microphone, or spying, and Hovanec has not alleged those types of intrusions. Miller contends that "Plaintiff presents no facts to support the proposition that Traci Miller ever actually accessed the terminated iCloud account" and that there are no cases supporting the

proposition that the act of accessing "a deserted cloud account" is an intrusion of someone's solitude, seclusion or private affairs. Docket no. 9 at 9.[10] Miller further argues that creating the alisontheloser account and sending insulting emails does not state a claim.

Hovanec has alleged that Miller secretly and without authorization accessed her iCloud account. Hovanec contends that "federal courts in Texas have recognized that hacking into a person's private computer[11] constitutes an intentional intrusion that would be offensive to the average person and give rise to a claim for invasion of privacy." Docket no. 12 at 6 (citing *Coalition for an Airline Passengers' Bill of Rights v. Delta Air Lines*, 693 F. Supp. 2d 667 (S.D. Tex. 2010), *Bray v. The Cadle Co.*, No. 4:09-cv-663, 2010 WL 4053794 (S.D. Tex. Oct. 14, 2010), and the Restatement (Second) of Torts § 652B). The Southern District of Texas did find that "hacking into a person's private computer and stealing personal correspondence would represent an intentional intrusion on the victim's private affairs and that such an intrusion would be highly offensive to a reasonable person." *Delta Air*, 693 F. Supp. 2d at 675. Other courts have also concluded that unauthorized access to personal emails may be a highly offensive intrusion. *Stirling Int'l Realty*, 2015 WL 403318, at * 6 (and listing cases). In this case, if Miller accessed only the emails related to creation of the alisontheloser@gmail.com, then this claim would fail. But if Miller accessed more or all of the private information contained in Hovanec's iCloud account, as Miller alleges, this could plausibly state a claim. The motion to dismiss this claim is denied.

---

[10] In the Amended Complaint, Hovanec explains that the creator of alisontheloser@gmail.com must have had access to her iCloud account because the creator clicked on the verification link in the email to alisonluevano@me.com. Elsewhere, Hovanec alleges that Miller obtained her iCloud password and "accessed her iCloud information where all of Hovanec's personal information including emails, text messages, contacts, photographs, financial and personal health information were stored." Am Compl. at para. 32. However, Plaintiff provides no specific allegations of such access, even though she has hired experts to determine the extent of the breach. The only specific access alleged is to the verification email on May 16.

[11] Again, Plaintiff has not alleged that Miller hacked into her private computer. The only allegation is that Miller obtained the password to and accessed Plaintiff's iCloud account.

**Intentional Infliction of Emotional Distress**

Hovanec alleges that "MILLER intentionally caused HOVANEC severe emotional distress by sending fictitious and offensive emails to her and her mother using the email address, alisontheloser@gmail.com. The acts committed by MILLER to illegally access HOVANEC'S iCloud and send offensive emails using HOVANEC'S name is extreme and outrageous behavior that rises to the level of a criminal offense. The severity of MILLER'S outrageous acts of cyberbullying are compounded by the fact that MILLER had purported to be a caring friend of HOVANEC'S, and their minor daughters were classmates and close friends. The outrageous conduct of MILLER proximately caused HOVANEC emotional distress, and no alternative cause of action provides a remedy for the recovery of damages for the severe emotional distress she has suffered." Am. Compl. para. 37. Miller contends that IIED is a gap-filler tort, and thus Plaintiff's assertion of other causes of action indicates that there should be no recovery under this theory. Hovanec responds that if she cannot succeed on her federal claims, then IIED is "the claim for which she can obtain relief for the outrageous conduct committed by MILLER" and dismissal is premature. Docket no. 12 at 7.

Miller's motion to dismiss this claim is denied. As Miller notes, the act of creating the alisontheloser@gmail.com and sending disparaging emails is not itself a violation of the various statutes at issue here. Thus, these actions could fall within the gap-filler scheme of the intentional infliction of emotional distress tort.[12] Miller's motion to dismiss this claim is denied.

---

[12] Without knowing the content of the emails, the Court is unable to determine whether the sending of two emails is "extreme and outrageous" conduct, but in any event Miller has not moved for dismissal on this ground.

## Luevano's Motion

Defendant Moises Luevano moves the Court to dismiss the claims against him and refer them to arbitration pursuant to Hovanec and Luevano's Mediated Settlement Agreement (M.S.A.) in their divorce proceeding. Luevano states that Hovanec filed an Original Petition for Divorce on May 15, 2014, and that they agreed to temporary orders on September 23, 2014 that "shall continue in force until signing of the Final Decree of Divorce or further order." The Standing Order in effect when the divorce action was filed prohibited the parties from "intercepting or recording the other party's electronic communications." And the Standing Order applicable in 2015 prohibits the parties from "opening or diverting mail or email or any electronic communication addressed to the other party." Both versions of the Standing Order state that "any part of this order not changed by some later order remains in full force and effect until the court signs a final decree." The temporary orders prohibited the parties from "destroying, disposing of, or altering any email or other electronic data relevant to the subject matter of the case, whether stored on a hard drive or on a diskette or other electronic storage device."

The parties entered into the M.S.A. on May 14, 2015. In the M.S.A. the parties agreed to compromise and settle the claims and controversies between them regarding dissolution of their marriage. Defendant asserts that Judge Richard Price orally granted the parties' divorce and approved the M.S.A. on May 15, 2015, but has not entered a final Decree of Divorce. The M.S.A. states that the case shall be resolved by an agreed decree of divorce. Luevano therefore contends that all of Hovanec's claims are subject to arbitration pursuant to a clause in the M.S.A. stating:

If one or more disputes arise with regard to the interpretation of this Agreement or any of its provisions as to the content or drafting of a formal order or Judgment, or any substantive dispute arising prior to the entry of a Decree of Divorce (including as to matters that arise for the first time after this Mediated Settlement Agreement is signed by the parties, their attorneys and the mediator), the parties agree to submit said dispute(s) to VICTOR H. NEGRON, JR., who shall act as Arbitrator regarding said disputes and whose decision shall be binding on the parties, and the parties shall share the costs of same as assessed by the Arbitrator, and shall pay such fees upon demand by the Arbitrator.

Plaintiff's Amended Complaint (para 17) states, "It is important to note that on May 15, 2014, HOVANEC filed for divorce from LUEVANO and although she and LUEVANO reached a mediated settlement agreement on May 14, 2015, as of May 18, 2016, HOVANEC and LUEVANO had still not entered a final decree of divorce. Accordingly, at the time all of her AOL emails were deleted, HOVANEC was still engaged in confidential communications with her family law counsel regarding her divorce." In paragraph 19, Hovanec alleges that

from at least the date that HOVANEC filed for divorce on May 15, 2014, LUEVANO was under a duty to disclose the fact that he was the master accountholder of HOVANEC'S primary, and at the time only, email account but instead he chose to breach his fiduciary duty to her and conceal the fact that he could intercept and was in fact accessing HOVANEC'S personal and confidential emails throughout their marriage and even during the pendency of their divorce. Indeed, LUEVANO not only breached his fiduciary duty to his wife by accessing her emails without her consent, he also acted in contempt of paragraph 3.6 of the Bexar County Standing Order Regarding the Conduct of Parties in a Divorce that expressly forbids parties to a divorce from opening or diverting each other's emails.

And, in paragraph 20, she alleges that "[t]he unbridled access to HOVANEC'S confidential emails gave LUEVANO an unfair and illegal advantage during the entire pendency of their divorce proceeding."

Luevano argues that Hovanec's claims are subject to the arbitration clause. Hovanec argues that the arbitration clause only applies to suits affecting the parent child relationship,

which this is not, that this is not a dispute concerning the interpretation of M.S.A. or any of its provisions as to the content or drafting of a formal order or judgment, and that the arbitrator Victor Negron (who also drafted the arbitration clause) has concluded that Hovanec's claims are not subject to the arbitration clause.

The Court utilizes a two-step analysis to determine whether a party may be compelled to arbitrate. First, the Court asks whether the party has agreed to arbitrate the dispute by examining whether there is a valid agreement to arbitrate claims and whether the dispute in question falls within its scope. If so, the Court examines whether any statute or policy renders the claims non-arbitrable.

The parties agree that they entered into an arbitration agreement in the M.S.A., but they dispute whether Hovanec's current claims fall within its scope. Mediated settlement agreements are utilized to resolve suits for dissolution of a marriage and suits affecting the parent-child relationship. TEX. FAMILY CODE §§ 6.602, 153.0071.[13] As the Texas Supreme Court explained:

> Under the Texas Family Code, "a mediated settlement agreement, meeting certain statutory formalities, is binding on the parties and requires the rendition of a divorce decree that adopts the parties' agreement." *Milner v. Milner*, 361 S.W.3d 615, 618 (Tex. 2012); TEX. FAM. CODE § 6.602. Because an MSA is a contract, we look to general contract-interpretation principles to determine its meaning. *See* TEX. CIV. PRAC. & REM. CODE § 154.071(a) ("If the parties reach a settlement and execute a written agreement disposing of the dispute, the agreement is enforceable in the same manner as any other written contract."). When construing a contract, "a court must ascertain the true intentions of the parties as expressed in the writing itself." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). "We give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996).

---

[13] Although Hovanec argues that the arbitration clause in the M.S.A. applies only to a suit affecting the parent-child relationship and therefore can require arbitration of only such suits, Miller correctly notes that they are authorized and used in divorce proceedings as well as SAPCRs.

*Loya v. Loya*, 526 S.W.3d 448, 451 (Tex. 2017); *Brooks v. Brooks*, 257 S.W.3d 418, 421 (Tex. App.–Fort Worth 2008, pet. denied) ("Mediated settlement agreements are binding in suits affecting the parent-child relationship, as well as suits involving only marital property.).

Mediated settlement agreements often (and typically) contain arbitration clauses requiring arbitration of disputes regarding interpretation of the M.S.A. and drafting the final judgment and divorce decree. This arbitration clause contains such language, but it also broadly includes "any substantive dispute arising prior to the entry of a Decree of Divorce (including as to matters that arise for the first time after this Mediated Settlement Agreement is signed by the parties, their attorneys and the mediator)."[14] The only limits on this broad arbitration clause are that the dispute be "substantive" and that it arise prior to entry of the divorce decree.

The meaning of "substantive dispute" is unclear, and the parties have not provided the entire M.S.A., which might shed additional light on its meaning, due to confidentiality concerns. Substantive disputes would include the ultimate division of property or issues affecting the parent-child relationship that were involved in the litigation and would ultimately be resolved in the litigation (and/or would be covered in the M.S.A.). But here the Court must decide whether the phrase also includes disputes about whether the parties' conduct violated temporary orders or Standing Orders during the pendency of the divorce/SAPCR, and whether it includes alleged violations of federal statutes and Texas common law.

Plaintiff alleges that Luevano accessed her private emails throughout their marriage, and throughout their divorce, in violation of the Standing Orders, providing Luevano an unfair

---

[14] Hovanec's response to Luevano's motion completely ignores this portion of the arbitration clause.

advantage in the divorce. Plaintiff sues for breach of fiduciary duty based on these claims. She acknowledges that this claim could "arguably be said to have some bearing on the interpretation of the Mediated Settlement Agreement as well as some 'natural extension' to the entry of a decree," but argues that is only because it could be a basis to set aside or preclude the enforcement of the very M.S.A. that contains the arbitration clause (though she has not argued that it should be set aside). As such, however, the allegations could bear directly upon the terms of a final divorce decree.

Hovanec argues that the federal claims are not subject to the arbitration clause. But to determine whether a party's claims fall within an arbitration agreement's scope, we focus on the complaint's factual allegations rather than the legal causes of action asserted. *Jones v. Halliburton Co.*, 583 F.3d 228, 240 (5th Cir. 2009); *Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 900 (Tex. 1995). If the allegations touch upon matters covered by the agreement, then the claim is subject to arbitration regardless of the legal label attached to it. *Saks v. Rogers*, No. 04-16-00286-CV, 2017 WL 3159712, at *6 (Tex. App. – San Antonio July 26, 2017, pet. filed). Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Jones*, 583 F.3d at 235. Because the factual allegations concerning Luevano's access to Hovanec's emails throughout the marriage are relevant to the divorce and could affect the terms of the final divorce decree, the Court concludes that the claims are substantive disputes within the meaning of the arbitration clause. The Court finds that no statute or policy would preclude arbitration of the claims.

When claims are subject to arbitration, the Court must stay the trial of the action until the arbitration is complete. 9 U.S.C. § 3. But the Court may also, in its discretion, dismiss the

case when all of the claims must be submitted to arbitration. *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992); *Pacheco v. PCM constr. Servs., LLC*, 602 F.App'x 945, 949 n.2 (5th Cir. 2015). Luevano's motion is therefore granted.

## Conclusion

Moises Luevano's Motion to Dismiss (docket no. 7) is GRANTED and Plaintiff Hovanec's claims against Luevano are DISMISSED because they must be submitted to arbitration.

Traci Miller's Motion to Dismiss (docket no. 9) is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to Hovanec's claims under the Federal Wiretap Act, the Texas Criminal Wiretap Act, and the conspiracy claims, and those claims are DISMISSED WITH PREJUDICE. Miller's motion is further GRANTED as to Hovanec's CFAA claim, but with leave to amend. The motion is DENIED as to the state tort claims.

It is so ORDERED.

SIGNED this 7th day of March, 2018.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE