# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

ALISON HOVANEC,  §
§
   *Plaintiff,*  §
§
v.  §  Civil Action No.  SA-17-CV-766-XR
§
TRACI MILLER,  §
§
   *Defendant.*  §

## ORDER

On this date, the Court considered the Motion for Summary Judgment filed by Defendant Traci Miller (docket no. 75), and the responses and replies thereto. Plaintiff Alison Hovanec sues Traci Miller for violation of the Stored Communications Act ("SCA"), 18 U.S.C. § 2701 *et seq.*, violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.*, intrusion on seclusion, and intentional infliction of emotional distress. Miller moves for summary judgment on all claims. After careful consideration, the Court will deny the motion for summary judgment. The Court will set for a hearing Miller's request for exclusion of evidence under Rule 37(c) and Hovanec's motion for spoliation remedy.

### Factual and Procedural Background

Plaintiff Alison Hovanec was friends with Defendant Traci Miller, and from May 2013 to May 2015, Miller worked under Hovanec as a wardrobe consultant/sales person for two companies, Carlisle Etcetera LLC and W by Worth.  From May 2015 to Spring 2016, the relationship between Hovanec and Miller turned from friendly to somewhat antagonistic.

Hovanec alleges that in May 2015, Miller disparaged her to her father and also refused to sell clothes and canceled her show, which reflected poorly on Hovanec. Hovanec alleges that Miller would complain about Hovanec to other wardrobe sales consultants and upper management at Carlisle Etcetera LLC and W by Worth, leading to Hovanec's termination as the local Director of Business Development for W by Worth in May 2015. Plaintiff alleges that Miller than gloated about being offered the job. Hovanec states that she began distancing herself from Miller, and most of their contact was through their daughters, who remained best friends.

The undisputed summary-judgment evidence indicates the following. On Friday May 13, 2016, Hovanec and Miller and their daughters attended a movie in the park event. During the event, Hovanec and Miller had a confrontation over the fact that Miller's daughter did not want to spend the night with Hovanec's daughter at Hovanec's house. Hovanec and her daughter left the park, and Hovanec told Miller she would be contacting the girls' school about the incident. Miller tried texting and calling Hovanec on Saturday, but Hovanec did not respond.

On May 16, 2016, Miller viewed Hovanec's LinkedIn profile and "unfriended" Hovanec. Miller depo. at 138. Miller testified that she "disabled [Hovanec's] connection to me on all social media." *Id.* Also on May 16, Miller contacted Carlisle Etcetera about a blouse she purchased through Hovanec in November 2015 and then returned because she had not received a return credit. Miller depo. at 119. Miller testified that she contacted Carlisle Etcetera that day "because it had become apparent to me that the relationship between us was dissolved" because Hovanec would not return her calls on Saturday. *Id.* at 119-120. That same day, Hovanec received an email from Carlisle Etcetera, regarding Miller's message about the blouse refund.

On May 16, 2016 at 12:05 p.m., Hovanec received an email from "Alison Hovanec" from the email address alisontheloser@gmail.com titled "Joel's so Called Divorce" that referred to her as "such as sucker." Hovanec's mother also received an email from that address entitled, "Your Daughter is dating a married man!" and making disparaging remarks about her, including that she was a loser who was in a "downward spiral" and was not competent or able "to keep a job for more than a few months." The Joel/"married man" referenced in the emails was Joel Sauceda, Hovanec's occasional boyfriend.

Hovanec contacted Sauceda and asked him if he knew what to do to identify the person sending the emails and stop them. Sauceda owns an internet technology company and began devising a plan to identify the person through capturing their IP address.[1] Because the sender's email address was a gmail account, Sauceda would not be able to obtain the sender's IP address from the email itself, so he wanted to bring the user outside of gmail. Sauceda created a gmail account Roslynjames1954@gmail.com and began communicating by email with alisontheloser@gmail.com. Roslyn James was just a name he made up. Sauceda depo. at 120.

Pretending to be Roslynjames1954, Sauceda wrote "I need info. must talk on private line. he will go down. working for the man." The user at alisontheloser@gmail.com responded, "Working for what man? He is the agent of record for about a dozen different business entities all run out of a small crappy office in San Antonio. His house has been foreclosed on in Summerglen and license revoked involuntarily for Ad Plotter due to unpaid taxes. He lives in an apartment and drives a leased Mercedes. He is a total con artist. If you are a PI you can easily

---

[1] An IP (Internet Protocol) address uniquely identifies a particular network-connected device like a wi-fi router. *United States v. Weast*, 811 F.3d 743 (5th Cir. 2016).

find all this out yourself." Sauceda was "pretty shocked" that he got a response and wanted to get the person curious enough to click on a link to a webpage so he could capture their IP address. Sauceda depo. at 120, 122.

Sauceda owned the domain greenpowur.com and created a webpage on that domain, on which he installed code provided from a web analytics company called statcounter that he knew would capture the IP address of a visitor to the page. Sauceda depo. at 49-51, 66.[2] Sauceda sent another email from roslynjames1954@gmail.com to alisontheloser@gmail.com stating, "he is up to some other crap now have you seen this green power thing he is doing? I do not see a corp registration for this. look at this page he has up. another scam." That email contained a link to the webpage on greenpowur.com that included statcounter code to capture the IP addresses of page visitors.

On the morning of May 17, Sauceda discovered from his statcounter report that the user had clicked on the link, and the statcounter report provided the user's IP address (108.65.34.232) and identified the user as having an AT&T U-Verse account, using a mac operating system (OS X) with a Safari browser, and being located in San Antonio, Texas. Sauceda's expert report states that the person clicked on the link, "where the static[3] IP address of 108.65.34.232 was captured along with identifying information to include a close proximity to Hovanec's house at

---

[2] Internet users "broadcast [their] IP address far and wide in the course of normal internet use." *United States v. Weast*, 811 F.3d 743, 747 & n.13 (5th Cir. 2016) (citing *United States v. Christie*, 624 F.3d 558, 563 (3d Cir. 2010) ("IP addresses are also conveyed to websites that an internet user visits, and administrators of websites . . . can see the IP addresses of visitors to their sites.")).

[3] Sauceda has admitted to being confused about the difference between a static and dynamic IP address at the time he wrote his report, and to incorrectly using the term "static IP address" in his report. Sauceda depo. at 71-72.

[address] San Antonio, TX 78216, a MAC operating system along with AT&T Uverse service."
Sauceda report at ¶ 6.[4]

Sauceda asked Hovanec if she knew who it could be. Hovanec had been in Miller's house many times and knew that Miller had AT&T U-Verse and a Mac operating system, and thus Hovanec suspected it was Miller behind the alisontheloser@gmail.com emails. Hovanec knew that Miller used a gmail account, so Sauceda determined that he would not be able to capture her IP address from an email. Hovanec and Sauceda devised a plan to email Miller and get her to click on a link to a webpage with the statcounter code to compare Miller's IP address to the one used by alisontheloser@gmail.com. They decided to do so using an email about the Carlisle Etcetera blouse return.

Sauceda set up a different webpage on another domain he owned (shallybrady.com) and Hovanec sent Miller an email to Miller's personal email account tracilmiller@gmail.com about the message from Carlisle Etcetera and the blouse refund. Sauceda created an image of the Carlisle Etcetera email on the shallybrady.com webpage. On May 17, Hovanec emailed tracilmiller@gmail.com a link to the image, writing "I received this from Etcetera yesterday." The email indicated that, to see the entire image, Miller would have to click on the link, which would take her to the shallybrady.com webpage with the statcounter code. Miller clicked on the image, which took her to the shallybrady.com webpage, and the statcounter report showed the IP address 108.65.34.232, with the user having a Mac operating system (OS X) with a Safari

---

[4] However, the "exhibit D" within the report shows only a location of "San Antonio, Texas" and does not otherwise indicate a location near Hovanec's home. In addition, during his deposition, Sauceda testified only that statcounter "will identify things like this person lives in the San Antonio area." Sauceda depo. at 82. Thus, there is no supporting evidence before the Court that statcounter identified the user as being in close proximity to Hovanec's house.

browser, and an AT&T U-Verse account.[5] This was the same IP address and information as the alisontheloser@gmail.com visitor.

On May 17, 2016 at 3:38 p.m., Hovanec sent an email to Miller that included a preservation of records letter from her attorney. Docket no. 77 Ex. K. Miller admitted receiving the email. Miller depo. at 142. She testified that she did not take any action that day or afterwards to preserve the type of information described in the letter. *Id.* at 144. However, she called a friend who was an attorney. *Id.* at 145.

Later on May 17, Sauceda sent another email as roslynjames1954@gmail.com to alisontheloser@gmail.com, and received a delivery failure notification from Gmail that the account did not exist. Sauceda report Ex. H. Discovery from Google reveals that the alisontheloser@gmail.com email was deleted on May 17.[6] Hovanec suspects that Miller deleted the email account after receiving the email from Hovanec's lawyer. Hovanec Aff. (docket 77-1) at 23.

On May 17, Miller called Hovanec's father and left a voice message saying, "I'm very worried about Alison and that's why I'm calling you. Something has to be done. She needs help.

---

[5] Sauceda's report states that the user clicked on the email link twelve times on May 17 from 12:06 p.m. to 3:33 p.m. This assertion is not entirely supported by the documentation on file, which includes an excel spreadsheet that does show twelve visits from the IP address but does not include dates or times. Docket no. 74-6. Miller testified at her deposition that she clicked on the link and was confused because it took her to the shallybrady.com website and apparently did not show the email. Because she was confused and thought the link might be broken, and "wanted to see what Etcetera might have said," she clicked on the link numerous times. Miller depo. at 139-141, 155.

[6] Google responded to a subpoena from Defendant's counsel in October 2018. The response shows that the alisontheloser@gmail.com email account was created May 16, 2016 and deleted May 17, 2016. There is no user IP data provided. Docket no. 75-8.

Please call me." Miller depo. at 135. Miller testified that she looked up his phone number online. *Id.*

On May 18, Hovanec made a routine review of her AOL email account, which she had used since 2001, and discovered that all of her 9,780 emails had been deleted. Many of these emails contained confidential attorney-client communications concerning her divorce proceedings. Although Hovanec and her ex-husband Moises Luevano had reached a Mediated Settlement Agreement on May 14, 2015, they still had not entered a final decree of divorce in May 2016. Hovanec contacted AOL and was informed that Luevano was the primary account holder and she was only a sub-accountholder. Hovanec then sought and obtained records regarding activity on the account and found that Luevano had accessed the account at 5:53 p.m. (after he had deleted the emails) to surreptitiously override the password changes that Hovanec made immediately after she learned that the emails had been deleted so that he could keep her out of her own email account. Hovanec learned that Luevano had always possessed the ability to access her emails, and realized that he had been accessing her emails throughout their marriage and during the pendency of their divorce to obtain information.

In the following months, Hovanec spent a considerable amount of time reorganizing her deleted emails and incurring legal expenses in connection with "the computer breach." In this process, on October 13, 2016, she accessed an old iCloud account to recover some personal emails and photographs that had been placed in her iCloud through her iPhone. In September 2015, Hovanec had stopped using her iPhone and iCloud because she felt that her information may have been compromised and that Luevano could track her whereabouts. Because she could

not recall her password, she contacted Apple and was emailed a link to reset her password and gain access to the iCloud account that she had not accessed for approximately thirteen months.

Upon opening her iCloud using her old Apple ID email address aliluevano@me.com, Hovanec discovered an email to that address from Google at 10:52 a.m. on May 16 stating that there was a request to add aliluevano@me.com email to "your Google account." Another email was sent to that address stating that the alisontheloser@gmail.com account had been created at 10:53 a.m. The first email required the user to click a link to "verify" the request to add aliluevano@me.com to the Google account. Plaintiff alleges that Miller accessed her aliluevano@me.com email account to click the link to verify the addition of aliluevano@me.com to the alisontheloser@gmail.com account. Another email was sent to the aliluevano@me.com address on May 17 at 4:28 stating that the Google account alisontheloser@gmail.com was deleted, and "[y]ou received this message because aliluevano@me.com is listed as the recovery email for alisontheloser@gmail.com." Plaintiff contends that this shows that Miller, who Plaintiff contends was the user behind alisontheloser@gmail.com, had access to her iCloud account and clicked on the link in the email to verify the addition of aliluevano@me.com to the alisontheloser Gmail account.

Plaintiff filed her Original Complaint on August 14, 2017 against Miller and Luevano for violations of the Federal Wiretap Act, the Texas Criminal Wiretap Act, the Computer Fraud and Abuse Act ("CFAA"),[7] civil conspiracy, intrusion on seclusion, intentional infliction of

---

[7] The CFAA prohibits certain intentional or knowing access to a protected computer without authorization. 18 U.S.C. § 1030; *Larson v. Hyperion Intern. Technologies, LLC*, No. 12–50102, 494 F. App'x 493, 497 (5th Cir. 2012). The statute provides a civil remedy for any person who suffers damage or loss resulting from such a violation. 18 U.S.C.A. § 1030(g); *Fiber Systems Intern., Inc. v. Roehrs*, 470 F.3d 1150, 1156 (5th Cir. 2006).

emotional distress (against Miller only), and breach of fiduciary duty (against Luevano only). Defendant Luevano filed a motion to dismiss, arguing that all the claims against him had to be dismissed and submitted to arbitration. Defendant Miller filed a motion to dismiss all the claims against her for failure to state a claim under Rule 12(b)(6). Plaintiff then filed an Amended Complaint as of right, adding a claim under the Stored Communications Act ("SCA").[8]

The Court granted Luevano's motion to dismiss the claims against him because they were subject to an arbitration agreement. The Court also granted in part and denied in part Miller's motion. Docket no. 22. Specifically, the Court dismissed the Federal Wiretap Act and Texas Criminal Wiretap Act claims because Hovanec failed to establish that Miller "intercepted" any emails. As to the CFAA claim, the Court dismissed the claim for failure to establish the required losses, but granted leave to replead. The Court also dismissed the conspiracy claims. The Court denied the motion to dismiss the intrusion on seclusion and intentional infliction of emotional distress claims. Because the SCA claim was added after the motion to dismiss was filed, the Court did not address that claim. The Court then issued a scheduling order and set the case for a status conference on May 2, 2018.

On April 16, Plaintiff provided her Initial Disclosures to Miller through her attorney Adam Cortez. Hovanec's initial disclosures listed three individuals as persons with discoverable

---

[8] The SCA "regulates the intentional access of stored electronic communications and records." *Borninski v. Williamson*, No. 3:02-CV-1014-L, 2005 WL 1206872, at *11 (N.D. Tex. May 17, 2005). Under the SCA, whoever: (1) "intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished...." 18 U.S.C. § 2701(a)(1); *see also Garcia v. City of Laredo, Tex.*, 702 F.3d 788, 790 (5th Cir. 2012) (stating that the SCA "prohibits accessing without authorization a facility through which an electronic communication service is provided and thereby obtaining access to an electronic communication while it is in electronic storage").

information: Alison Hovanec, Marilyn Hovanec ("can offer testimony regarding the events giving rise to this cause of action"), and Joel Sauceda ("has relevant information regarding the methodology used to determine the IP address of the Defendant MILLER"). The initial disclosures did not list any category of document or specific document that would be relevant to damages, other than broadly including a catchall category of "[a]ny other documents in any form that Plaintiff has in her possession, custody or control that may be relevant to any claim or defense." Docket no. 75-4 (Initial Disclosures). Under "Computation of Damages," Plaintiff's counsel wrote, "The Plaintiff is seeking damages that are still being calculated. The Plaintiff is also seeking reasonable attorney's fees as those are permitted by law" *Id.* According to Miller's motion for summary judgment, Hovanec did not supplement her disclosures or "produce any documentation on fees she claimed were permitted by law." Docket no. 75 at ¶ 13. Further, at her December 2018 deposition, Hovanec confirmed that no documents had been produced that establish actual damages. Hovanec depo. at 129-130.

On April 17, Plaintiff's counsel moved to withdraw, and thus Hovanec and her counsel were both ordered to appear at the status conference. At the status conference, the Court permitted Plaintiff's counsel Adam Cortez to withdraw and gave Plaintiff an opportunity to find new counsel. Plaintiff's new counsel John Carroll entered an appearance on May 21 and then filed motions seeking more time to complete discovery and designate experts and for leave to amend her complaint. Docket nos. 38, 39, 40. Miller, in turn, moved to dismiss all of Hovanec's claims with prejudice.

On June 7, the Court denied Miller's motion because the requirements for an involuntary dismissal with prejudice had not been demonstrated and granted Plaintiff an additional thirty

days to respond to Defendant's interrogatories and requests for production that were served on May 8 (making them due July 7, 2017). Docket no. 44. On June 13, the Court granted Plaintiff's motion for leave to file her Second Amended Complaint, which remains the live pleading. On June 15, the Court issued an amended scheduling order with a discovery deadline of October 31, 2018. Docket no. 47.

On July 2, Plaintiff Hovanec filed her expert designations, designating Joel Sauceda and Steven Scott Broderhausen as experts. Docket no. 49. On July 31, Miller moved to extend her expert designation deadlines, and the Court granted an extension until September 4, 2018. Docket no. 50 & Text Order dated August 1, 2018. On September 5, 2018, Miller again moved to extend her expert designation deadlines, and the Court granted an extension until October 5, 2018. Docket no. 54 & Text Order dated September 6, 2018. Miller designated her expert, Russell McWhorter, on October 5. Docket no. 61.

On September 28, Miller filed two motions to quash seeking to quash depositions of herself, her husband and fact witness Jason Miller, and expert Russell McWhorter (docket no. 57), as well as a subpoena issued by Hovanec to non-party AT&T (docket no. 58). The motions were referred to Magistrate Judge Farrer, who issued an order to confer and set the motions for a hearing on October 16. Docket no. 62. After conferring as ordered, the parties agreed that the depositions, as well as certain additional depositions, could proceed outside the discovery deadline of October 31, 2018, and asked the Court to approve an extension of the discovery deadline for the purpose of allowing the depositions. Docket no. 63. Miller also agreed to withdraw her objections to the third-party subpoena on AT&T. Magistrate Judge Farrer then cancelled the hearing, mooted the motions to quash, and ordered that the deadline to complete

discovery was extended to November 28, 2018 "for the sole purpose of completing the depositions referenced in the parties' joint advisory." Text Order dated October 24, 2018.

On November 15, 2018, Miller filed an unopposed motion to extend the scheduling order deadlines for dispositive motions (from November 19, 2018 to January 15, 2019). Docket no. 64. The Court granted the motion and also continued the trial date from February 25, 2019 to April 8, 2019. Docket no. 65 & Text Order dated Nov. 20, 2018. On December 28, Miller filed another unopposed motion to extend the deadline for filing dispositive motions to February 15, 2019. Docket no. 66. The Court granted the motion and also re-set the trial date to June 3, 2019. Docket no. 67 & Text Order dated Jan. 3, 2019. At no time did either party file a motion seeking to extend the discovery deadline, which had expired on October 31, 2018, except as extended to November 28 for depositions as ordered by Magistrate Judge Farrer.

The parties conducted depositions in late November and on December 5 and December 10, 2018. Miller contends that Sauceda's deposition was the first time Miller was made aware of the different GUIDs (globally unique identifiers) shown on the statcounter report and that it was the first time her expert had access to the statcounter data in native format. During the deposition, Sauceda logged into the program with Miller's expert McWhorter so that McWhorter could view the program and the data.

On January 17, 2019, Hovanec filed an opposed motion to compel responses from Miller to Hovanec's requests for production, seeking an order overruling Miller's objections to certain specific requests and requiring production. Docket no. 68. According to the motion, Hovanec served interrogatories and requests for production on Miller on August 15, 2018, and Miller timely responded on September 21, 2018, pursuant to an agreement between the parties to

extend the deadline. Hovanec's requests for production included RFP 3 "[a]ll data that was stored, retrieved, downloaded, restored, reconstructed, removed, deleted, salvaged, regenerated, and/or forensically extracted from the computer devices used by TRACI MILLER related to this action during the period of May 1, 2015 to the present time" and RFP 22 "Produce your MAC laptop, IPAD and smartphones used during the following time periods for inspection and retrieval of information under the guidelines set forth on the attached Exhibit 'A' utilizing search terms as set forth in these requests for production which you used during the following time periods: a. September 1, 2014 to July 1, 2015; b. April 1, 2016 to October 1, 2016; c. August 1, 2017 to present." Hovanec sought an order overruling Miller's objections and compelling responses.

The Court referred the motion to Magistrate Judge Farrer, who scheduled it for a hearing on February 7. Miller then filed a motion asking for a hearing on Hovanec's objections to Miller's Rule 45 subpoena at the February 7 hearing. Docket no. 70. Miller had served a Rule 45 subpoena on Hovanec via email on January 25, 2019. The subpoena directed Hovanec to produce her Apple laptop computer owned or utilized during April and May 2016 and to permit inspection and forensic imaging of the device and subsequent analysis of the data (limited to "the use and/or creation of the email address alisontheloser@gmail.com and any other alleged act against Ms. Alison Hovanec"). Hovanec had objected to the subpoena on the grounds that it was improperly served, unreasonably required same-day production, was an attempt to circumvent the requirements of Rule 34 by requesting the same item as certain RFPs previously served pursuant to Rule 34, and was filed outside the discovery period in an attempt to circumvent that deadline.

The Court denied the motion to set a hearing on the subpoena objections before Judge Farrer because no motion pertaining to the subpoena was currently pending for referral to Judge Farrer for him to consider at a hearing -- Hovanec had not moved to quash the subpoena and Miller had not moved to enforce it. The Court further noted that there were numerous problems with the subpoena, including that it was issued after the close of discovery and had been objected to under Rule 45(d)(2)(B). The Court directed the parties to confer and to file either a motion to compel or a motion to quash the subpoena, in which case the Court would consider the subpoena and any objections to it. The Court noted that, if no motion was filed, the Court would consider the issue resolved. No motion was filed.

The parties conferred on Hovanec's motion to compel as directed by Magistrate Judge Farrer and advised that, as to RFP 3 and RFP 22, they agreed "that Ms. Hovanec will provide protocol for examination of the requested data for Ms. Miller's review and discussion prior to production of any such data." Docket no. 71. On February 7, Magistrate Judge Farrer held a hearing and denied Hovanec's motion to compel, primarily on the basis that it was untimely.[9]

On February 15, Miller filed a motion to exclude Plaintiff's expert Joel Sauceda, and filed the instant motion for summary judgment. On July 2, the Court granted in part and denied in part the motion to exclude, ordering that Sauceda would be permitted to testify about the emails sent to alisontheloser@gmail.com and tracilmiller@gmail.com with links to Sauceda's webpages containing the statcounter code, and the resulting webpage views reported by

---

[9] Pursuant to Local Rule CV-16(d), "Absent exceptional circumstances, no motions relating to discovery, including motions under Rules 26(c), 29, and 37, shall be filed after the expiration of the discovery deadline, unless they are filed within 7 days after the discovery deadline and pertain to conduct occurring during the final 7 days of discovery."

statcounter and the information reported by statcounter, including the IP addresses. Docket no. 85. The Court concluded that Sauceda would not be permitted to testify that Traci Miller was the user/creator of alisontheloser@gmail.com. *Id.*

Miller raises three primary arguments in her motion for summary judgment: First, that she is entitled to summary judgment on all claims because there is no evidence of damages or loss for any claim. Second, she is entitled to summary judgment because Hovanec has failed to produce evidence that Miller had access to her iCloud account. And third, she is entitled to summary judgment because there is no evidence that Miller created or used the alisontheloser@gmail.com account. In response, Hovanec submits her own affidavit as evidence of damages and contends that she has provided sufficient evidence to raise a fact issue as to whether Miller created the alisontheloser@gmail.com email account and accessed Hovanec's iCloud account. Hovanec further contends that Miller improperly failed to preserve evidence, including her wireless router, iPhone, text and email messages, and computer, and asks the Court to apply a spoliation presumption that the lost evidence would have supported Plaintiff's claims.

## Summary Judgment Standard

Summary judgment is proper when the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986). A dispute of a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson*, 477 U.S. at 248. Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails . . . to establish the existence of an element essential to that party's case and on which that party will

bear the burden of proof at trial." *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The Court must draw reasonable inferences and construe evidence in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Although the evidence is viewed in the light most favorable to the nonmoving party, a nonmovant may not rely on "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence" to create a genuine issue of material fact sufficient to survive summary judgment. *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 853, 860 (5th Cir. 2004). The court "may not make credibility determinations or weigh evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 (2000); *Anderson*, 477 U.S. at 254-55.

## Analysis

### I.      No evidence of damages

Miller first moves for summary judgment on the basis that there is no evidence of damages to support recovery on any claim. Miller contends that there is no evidence because (1) Plaintiff did not produce "a computation of each category of damages claimed by the disclosing party" or provide any supporting evidence of damages in her initial disclosures as required by Federal Rule of Civil Procedure 26(a)(1)(A)(iii); (2) Hovanec refused to answer questions about her damages during her deposition, continuously citing attorney-client privilege; (3) no expert provided any evidence of damages; and (4) no witnesses have been identified as testifying on damages.

In response, Plaintiff makes the following arguments: (1) she may recover statutory damages for her SCA claim, which requires no showing of harm other than violation of the statute,[10] and she may also recover punitive damages because the violation was willful or intentional; (2) in any event her Affidavit establishes actual damages for the SCA claim because she describes how she was required to expend time and money to remediate the effects of the SCA violations[11] and describes her mental anguish; (3) she has presented evidence of her actual mental anguish damages in her Affidavit, which establishes actual harm for her CFAA claim, her intrusion on seclusion claim, and her intentional infliction of emotional distress claim; and (4) her mental anguish is corroborated by the affidavits of her mother Marilyn Hovanec and friend Mark Murrietta.

Other than the three referenced affidavits, Hovanec does not purport to rely on any documents to establish damages. She correctly asserts that her own Affidavit alone may be sufficient to deny summary judgment. "[A]n affidavit based on personal knowledge and containing factual assertions suffices to create a fact issue, even if the affidavit is arguably self-serving." *C.R. Pittman Constr. Co. v. Nat'l Fire Ins. Co.*, 453 F. App'x 439, 443 (5th Cir. 2011).[12]

---

[10] Hovanec does acknowledge a split of authority on whether a plaintiff may recover statutory damages in the absence of showing any actual damages. Docket no. 77 at 17.

[11] Hovanec's Affidavit contains a paragraph discussing how she had spent time recovering the emails deleted from her AOL account (¶ 34), but does not detail any time spent with regard to her iCloud account. Hovanec appears to allege that her ex-husband Moises Luevano deleted her AOL emails, but may also be alleging that Miller conspired with him in doing so.

[12] In contrast, conclusory and self-serving statements offered to support a theory rather than statements of fact based on personal knowledge are generally insufficient to create a fact issue. *See DIRECTV v. Budden*, 420 F.3d 521, 531 n.49 (5th Cir. 2005); *Lechuga v. S. Pac. Transp. Co.*, 949 F.2d 790, 798 (5th Cir. 1992) ("Conclusory statements

Hovanec's Affidavit states the following: (1) she was upset when her mother contacted her about having received the email from alisontheloser@gmail.com (¶ 16); (2) after discovering that she had also received an email, she "remained with [her] friend Mark Murrietta for the remainder of the afternoon as he was consoling [her] in regard to the frightening matters that were happening" (¶ 17); (3) she was alarmed and placed in fear for her safety after someone she suspected was Miller or acting in concert with her sent a harassing text message from a free google number from someone impersonating a man attempting to lure her into a private conversation and then turning aggressive after she rejected the meeting (¶ 23); (4) her life has been "forever changed since the moment [she] met Traci Miller in 2013 and allowed her into [her] life" (¶ 42); (5) she has been diagnosed with PTSD for which there is no cure and which can only be managed by lifelong psychotherapy and her life is filled with triggers that create a post-traumatic stress response to seemingly normal things (¶ 45); (6) she is afraid of Miller and that Miller will continue to defame and harass her in retaliation for filing this lawsuit and that she might eventually physically harm her (¶ 45); (7) Miller "stole [her] life" and she will "never be the same person [she] was before [she] met Traci Miller and will have a life long struggle with Post Traumatic Stress Disorder and the mental anguish, isolation, sorrow, fear, humiliation and constant distress" (¶ 46).

Marilyn Hovanec's Affidavit includes the following statement, "Alison contacted me to inform me that she too received a message from this person and she was extremely frightened." Docket no. 77-4 ¶ 3. Mark Murrietta's Affidavit includes the following statement, "At the time

in an affidavit do not provide facts that will counter summary judgment evidence, and testimony based on conjecture alone is insufficient to raise an issue to defeat summary judgment.").

Alison [received the email she] was recently unemployed and looking for a new job and had many concerns for her children so the comments about being a loser, in a downward spiral and not being able to keep a job and take care of her and her children at 40 years old were devastating, especially since it was coming from a stranger using her name and communicating with herself and her family. . . Alison told me that she was terrified to go home and felt the safety of her and her children were at stake. I remained with Alison, consoling her, for the rest of the afternoon until approximately 3:45 p.m. in the Olmos Park area until she felt it was safe to return home alone when neighbors would be returning from work." Docket no. 77-5 ¶ 3.

In reply, Miller objects to the affidavits of Alison Hovanec, Marilyn Hovanec, and Mark Murrietta because they were not provided during the discovery period and "are replete with inadmissible assertions, speculation and hearsay." However, none of the specific objections to Alison Hovanec's Affidavit are relevant to damages. As to Marilyn Hovanec's affidavit, Miller contends that paragraphs 2 and 3 are hearsay. Miller also objects to the Affidavit of Mark Murrietta as hearsay. Miller further argues that Hovanec's Affidavit "does not show damage" and that Plaintiff has failed to produce evidence to substantiate her claims "for more than 18 months." Docket no. 80 at 5.

The Court permitted Hovanec to file a Sur-Reply to address Miller's objections to her summary-judgment evidence. Docket no. 82. Therein, Hovanec correctly responds that she may create and submit affidavits to respond to the motion for summary judgment, and there is no requirement that they have been previously produced in discovery. She also responds that the alleged hearsay in Marilyn Hovanec's and Murrietta's affidavits relevant to damages is already

in evidence through Hovanec's Affidavit and that Hovanec will testify at trial. Further, she has designated both Marilyn Hovanec and Mark Murrietta as trial witnesses.

Hovanec's Affidavit is sufficient to raise a fact issue on the existence of actual damages, at least with regard to mental anguish damages. Because Plaintiff has produced some evidence of mental anguish damages in her Affidavit and can testify to her damages at trial, a no-evidence motion for summary judgment is not the appropriate way to resolve the damages issue at this time. Rather, the Court must consider whether the fact that Hovanec failed to provide damages information in her initial disclosures and refused to answer questions about damages at her deposition precludes her from offering damages evidence at this stage with regard to some or all claims. If certain evidence is excluded, then summary judgment may be appropriate, but the Court must first determine whether exclusion is warranted. *See E.E.O.C. v. Service Temps, Inc.*, No. 3:08-CV-1552-D, 2010 WL 1644909, at *5 (N.D. Tex. Apr. 22, 2010) (noting that the failure to comply with Rule 26 is insufficient alone to warrant summary judgment on damages and that, instead, "[t]o obtain summary judgment on this basis . . . [defendant] would be required to establish a right to relief under Rule 37(c) and, having secured that remedy, then point to the absence of evidence to support a claim that depends for its viability on evidence that the [plaintiff] can no longer use").

This issue is governed by the Federal Rules of Civil Procedure concerning discovery. The Rules of Civil Procedure require each side to produce initial disclosures without awaiting a discovery request, including "a computation of each category of damages claimed by the disclosing party – who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on

which each computation is based, including materials bearing on the nature and extent of injuries suffered." FED. R. CIV. P. 26(a)(1)(A)(iii). Further, "[a] party must make its initial disclosures based on the information then reasonably available to it. A party is not excused from making its disclosures because it has not fully investigated the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures." FED. R. CIV. P. 26(a)(1)(E). Last, a party who has made a disclosure under Rule 26(a) must supplement its disclosure "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." FED. R. CIV. P. 26(e)(1)(A).

"If a party fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions." FED. R. CIV. P. 26(a)(3). Further, if a party fails to provide information as required by Rule 26(a) or (e), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)." FED. R. CIV. P. 37(c)(1).[13]

---

[13] Here, no motion for sanctions under Rule 37(c) has been filed. Unless a motion is filed, only the "self-executing" exclusion sanction of Rule 37(c) can be applied.

Because of the way this issue has been presented (via a no-evidence motion for summary judgment), neither party addresses the relevant guidelines or factors for exclusion under Rule 37(c). Defendant did not seek any intermediate remedies or sanctions under Rule 37, such as by filing a motion, and instead has essentially moved directly to exclusion. However, Defendant's failure to move to compel does not excuse Plaintiff from complying with Rule 26(a), and the language of Rule 37 does not require a motion to compel before its exclusion sanction may apply.[14] However, before Rule 37(c) sanctions are applied, the opposing party must bring the failure to comply with Rule 26(a) to the court's attention, preferably in a timely manner, so that the court can address whether the failure was substantially justified or harmless.

Plaintiff's Second Amended Complaint seeks "actual damages in the sum of not less than $1,000,000.00" and "exemplary damages in the sum of $250,000.00." As noted, Rule 26(a) required Plaintiff to provide a computation of each category of damages claimed, with reference to supporting documents or other evidentiary material, unless privileged or protected from disclosure, upon which each computation is based, including materials bearing on the nature and extent of injuries suffered. The allegations in the Complaint further assert that Plaintiff has suffered unspecified "actual damages" for violations of the SCA, has "suffered injury, mental anguish, and damages" for intrusion on seclusion, and has suffered "severe emotional distress" for the intentional infliction of emotional distress. Second Am. Compl. ¶¶ 52, 59, 60.

---

[14] The Advisory Committee notes refer to the Rule 37(c) sanction as self-executing, and courts have held that a motion to compel is not required to impose Rule 37(c) exclusion sanctions. *See In re High Standard Mf'g Co.*, No. 16-3133, 2017 WL 3701223, at *6 (S.D. Tex. Bankr. Aug. 24, 2017) (citing cases); Adv. Comm. Note to 1993 Amendment to subdivision (c) ("The revision provides a self-executing sanction for failure to make a disclosure required by Rule 26(a), without need for a motion [to compel disclosure] under subdivision (a)(2)(A). . . This automatic sanction provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence, whether at a trial, at a hearing, or on a motion, such as one under Rule 56.").

In response to the Court's order on the motion to dismiss, which noted that the CFAA requires a plaintiff to establish loss exceeding $5000, Plaintiff set forth allegations of "damages under the CFAA," in which she asserts that she "is entitled to recover damages for the time she spent investigating and remedying the violations of the CFAA committed by Miller as well as the expenses incurred in connection with same." *Id.* ¶ 57. She alleges that she is entitled to be compensated at a rate of at least $25 per hour for every hour she was "forced to spend to respond to and remedy the CFAA violations" and that she has had to expend "at least 150 hours" on the violations by Miller, for a total of $14,500. *Id.* The Complaint further alleges that Plaintiff is entitled to recover the income/revenue that she lost as a result of Miller's alleged use of information she accessed in Plaintiff's iCloud account that led to Plaintiff's termination from W by Worth, and that this is "well in excess of $5000 per year since she lost her position in May 15." *Id.* The Complaint alleges that Plaintiff is entitled to recover fees paid to experts Broderhausen and Gallant to evaluate and respond to the CFAA violations, which at the time were approximately $5,000 and "still accumulating at the rate of $275.00 per hour." *Id.* Last, she alleged that she was entitled to attorney's fees for expenses incurred to address the CFAA violations.

Plaintiff has offered no explanation for the failure to disclose her damages computations initially or through supplementation. Plaintiff's deposition was taken December 10, 2018, after written discovery was closed. Miller's counsel attempted to ask Plaintiff questions clarifying the nature and extent of her damages claims, but Plaintiff often did not understand the question and repeatedly invoked attorney-client privilege.

Miller's counsel asked, "What are the damages that you believe that you have suffered as a result of the allegations that you have brought?" Plaintiff did not understand the question and answered, "Extraordinary." Hovanec depo. at 77-78. Miller's counsel asked, "Has it caused you to have PTSD?" and Hovanec answered "yes," but she was unable to attribute how much of her PTSD might be attributable to Miller's alleged actions as opposed to her divorce. *Id.* at 77-78. Plaintiff contended that Miller had bullied her since the litigation began by alienating her from her friends and this was included in her IIED claim, but she invoked attorney-client privilege when pressed further. *Id.* at 80-81. When asked about how much she felt she should receive in damages for her IIED and intrusion on seclusion claims, Plaintiff responded that "there's no cap," "it's up to the jury," and that she could not provide an amount or a calculation. *Id.* at 83-84.

When Miller's counsel attempted to obtain information about the CFAA damages, Plaintiff stated that she would have to refer to her attorney, and "I have a log I've, you know, written somewhere, I guess." *Id.* at 85. Apparently, however, that log was "in her attorney-client communications" and she claimed privilege, and also asserted that "we haven't come to the point in our court proceedings where this has been – where we need to have this all put together and presented." *Id.* at 88. Referring to the allegations in the Complaint that Plaintiff had expended 580 hours in investigating CFAA violations by Miller and Luevano, Miller's counsel asked "I'm asking you whether or not you have any evidence that establishes or provides backup for your claim that you spent 580 hours on these violations," and Plaintiff responded, "it's with my attorneys." *Id.* at 93. Counsel asked, "And would something have to be created in order to be able to show some type of backup for the 580 hours?" and Hovanec responded, "I don't think

so. But it might need to be put into a format for you however, you know, you want it." *Id.* at 94. Counsel asked Plaintiff how she intended to prove her damages in front of the jury and Plaintiff responded, 'I have an attorney here and that's attorney-client privilege. I mean, that's discussions that I'm going to have with my attorney in how we want to present that." *Id.* Counsel asked, "are you aware of the fact that you have not produced any evidence to me that supports that you have worked 580 hours on responding and remedying the violations of the Computer Frauds Act?" and Plaintiff responded, "Yes. I'm aware that you don't have it yet." *Id.* at 95.

Later, Miller's attorney asked what amount of damages Plaintiff was going to ask a jury to award for the SCA violations, and Hovanec stated "It's attorney-client privilege." *Id.* at 112-113. Miller's counsel responded, "Your damages is not attorney-client privilege," and Hovanec responded, "At this time. Because it's discussions that I've had with my attorneys." *Id.* at 113. Miller counsel then asked, 'You have no personal opinion then, as to what you should be awarded if this case goes to trial and a jury makes findings against Traci Miller," and Plaintiff responded, "At this time, no." *Id.* She answered the same for each cause of action. *Id.*

When asked about her attorney's fee payments, Plaintiff responded "I didn't pay the bill. . . . Somebody else did. And that's attorney-client privileged communication." *Id.* at 114-115. When asked what was the basis for the $1 million in actual damages sought, Plaintiff responded, "That's attorney-client privilege." *Id.* Plaintiff appeared to be confused about whether the question asked for an amount of actual damages or the underlying bases for the damages, stating "I don't know what the actual damages are at this time because there are sections in here [the

Complaint] that don't have a cap on them." *Id.* at 120. Counsel's further questioning about the

basis for her $1 million demand led to further confusion.[15]

In the end, Plaintiff refused to answer any questions relevant to her damages:

> Q. If Traci Miller accessed your iCloud account as you allege, how did it cause you actual damages in the sum of not less than 1 million dollars? . . .

> A. I'm just trying to figure out, you know – because I can't give you that answer. Like I've said, it's up to a jury and it's up for presentation of the case.

> Q. No ma'am. Not with actual damages. Actual damages are damages you really did incur as a result of these types of . . . torts and violations that you allege. . . .. if Traci Miller accessed your iCloud account, how did that cost you actual damages in the sum of not less than 1 million dollars?

> A. It might have cost me more than a million dollars.

> Q. Right. And I'm trying to figure out how it did.

> A. And I don't have the numbers for you today. . .

> Q. Ms. Hovanec – and when you assert actual damages. I am entitled to be able to figure out, find out what those actual damages are.

> A. And I can't speak to that because it's attorney-client communication. It's attorney –

> Q. Your damages ma'am –

> A. attorney-client.

> Q. Your damages are not attorney-client privilege.

> A. They are at this time.

---

[15] Q. Did you have to pay anybody a million dollars as a result of the acts that you allege took place in your Second Amended Complaint? A. I think that's – no. I mean, the answer is no, not a million dollars. Q. Okay. Did you pay multiple parties increments that added up to a million dollars as a result of the acts that occurred allegedly and asserted in your Second Amended Complaint? A. Was I supposed to?

Q. So am I to understand from your testimony at this time that you are not prepared to provide me with any evidence of your actual damages in this case?

A. Yes. You're correct.

Q. Okay. And ma'am, there are no documents that you have produced to your knowledge that establish any of the actual damages that you assert in the Second Amended Complaint filed in this lawsuit.

A. That is correct.

*Id.* at 126-130.

It is clear that most of the time Hovanec was not understanding the questions being asked and that she often was mistaken about whether information was subject to attorney-client privilege. However, counsel on both sides failed to adequately deal with the problems that arose during the deposition. Hovanec's counsel should have been able to discern what Miller's counsel was asking for, and should have explained to Hovanec how to appropriately answer the questions and that most of the information being sought was not in fact subject to attorney-client privilege. Instead, Hovanec's counsel sat idly by and did nothing to make the deposition productive on the damages issue. However, Miller's counsel also failed to move to compel or otherwise seek available relief from the Court for Hovanec's refusal to answer basic questions about damages, possibly because the parties waited to conduct the deposition after the discovery deadline, thus limiting court intervention to "exceptional circumstances." Neither party sought to re-open discovery, despite the myriad discovery problems that had arisen.

Rule 26's requirements and the Rule 37 sanctions aim to prevent an ambush, resulting in surprise or prejudice, of undisclosed or late-disclosed evidence. *Joniback Mgmt. Trust v. Warburg Enters.*, 136 F. Supp. 3d 792, 808 (S.D. Tex. 2015) (citing *Reed v. Iowa Marine &*

*Rrepair Corp.*, 16 F.3d 82, 85 (5th Cir. 1994)). Plaintiff failed to provide the required disclosures on damages, and then thwarted Defendant's attempt to clarify her damages at her deposition. Plaintiff's repeated invocation of attorney-client privilege to damages questions during her deposition was patently improper,[16] and Plaintiff's counsel failed to advise Plaintiff to answer the questions as he should have. As a result of the failure to provide required disclosures and Plaintiff's refusal to answer questions during her deposition, Plaintiff essentially provided no evidence of damages (other than testifying that she has PTSD) until responding to Defendant's motion for summary judgment, and even then the Affidavit provides little in the way of specific evidence of "losses" as defined by the CFAA or lost wages. Yet Hovanec apparently wishes to proceed with all of her damages claims and evidence at trial. This is exactly the scenario that Rule 26 and Rule 37 aim to avoid.

Thus, the Court must consider whether the failure to disclose was substantially justified or harmless, including whether the information has been otherwise made known during discovery or in writing. Generally, the burden of proving substantial justification or harmlessness is on the nondisclosing party. To determine whether a failure to disclose was harmless, the Court evaluates four factors: (1) the explanation for the failure to disclose; (2) the importance of the information; (3) potential prejudice to the opposing party of including the evidence; and (4) the availability of a continuance to cure such prejudice. *CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 280 (5th Cir. 2009).

---

[16] Plaintiff appeared to be under the mistaken impression that because she had compiled information and sent it to her attorney or had discussed damages with her attorney, information related to damages was privileged. However, underlying factual  information does not become privileged simply because the client informs her attorney of the fact in a communication.

Again, because of the way this issue has been presented, neither party addresses the relevant analytical factors. Plaintiff provides no explanation for the failure to disclose, either through initial or supplemental disclosures, and fails to explain why counsel did not instruct Plaintiff to answer damages questions at her deposition. Neither party addresses the importance of the information to Hovanec or prejudice to Miller, a critical factor in the analysis. When considering prejudice, the court looks both to prejudice to the other party's ability to evaluate the case and prepare for trial and prejudice that may occur if the evidence is used at trial. Nor does either party address whether a continuance could cure any potential prejudice.

The Court thus finds that resolution of the Rule 37(c) exclusion sanction is not feasible at this time. Rather, the Court will set this issue for a hearing. The Court notes, however, that Plaintiff is seeking primarily mental anguish damages for her claims. This is alleged in the Complaint and Plaintiff testified at her deposition that she suffers from PTSD. Since compensatory damages for emotional distress are necessarily vague and are considered a fact issue for the jury, they may not be amenable to the kind of calculation disclosure contemplated by Rule 26(a). *Williams v. Trader Pub. Co.*, 218 F.3d 481, 486 n.3 (5th Cir. 2000). Thus, "courts have not required a Rule 26 computation regarding the amount of emotional distress-related compensatory damages claimed in cases in which the plaintiff does not intend to suggest an amount to the jury. In other words, if the plaintiff intends to suggest a specific amount of emotional distress-related compensatory damages to the jury, he or she must produce the disclosures required by Rule 26. If, however, the plaintiff intends to leave the determination of emotional distress-related compensatory damages solely to the jury, a Rule 26 disclosure is not required." *E.E.O.C. v. General Motors Corp.*, No. 3:06-cv-19-WHB-LRA, 2009 WL 910812,

at *2 (S.D. Miss. Apr. 1, 2009) (and citing cases); *see also E.E.O.C. v. Service Temps Inc.*, 679 F.3d 323, 334 (5th Cir. 2012) (affirming a district court's instruction that the EEOC would not be able to argue a specific damages amount before the jury when it failed to provide damages computations). Consistent with these cases and Hovanec's answers at her deposition reflecting a position that she preferred to leave the determination of compensatory damages for mental anguish solely to the jury, the Court is inclined to allow her to testify about her mental anguish but not allow her to suggest a dollar award to the jury at trial. However, the Court will revisit this issue at the hearing. Further, the parties will need to be prepared to address the extent wo which evidence of medical expenses related to her mental anguish may be precluded.

Resolution of the damages issue with regard to the CFAA claim is more difficult. As noted previously in the Court's order on the motion to dismiss, the CFAA expressly requires a loss during any one-year period aggregating at least $5,000 in value. Docket no. 22 at 9. The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).[17]

---

[17] Some courts have construed the definition of "loss" to include only the two subtypes of loss set forth in the CFAA: (1) costs incurred due to investigating, responding to, and correcting damage caused by a violation, and (2) costs incurred, revenue lost, or other damages resulting from an interruption of service. *E.g.*, *Stirling Int'l Realty, Inc. v. Soderstrom*, No. 6:14-CV-1109-Orl-40TBS, 2015 WL 2354803 (M.D. Fla. May 15, 2015). Other courts, however, have noted that a statute's use of "including" is illustrative rather than exhaustive, such that "any reasonable cost" may include costs not expressly delineated in the statute. *E.g.*, *Motio, Inc. v. BSP Software LLC*, No. 3:16-cv-00331-O, 2016 WL 9559916, at *15 (N.D. Tex. May 27, 2016) ("[T]he Court declines to follow *Alliantgroup* and *Quantlab*, as they interpret the phrase 'reasonable cost to any victim, including the cost . . .' as strictly limiting the 'cost' to the list of terms following 'including.'").

Plaintiff alleges that Miller violated the CFAA by accessing information in Hovanec's iCloud account, including emails, contacts, and personal information and then used the information to make unfounded complaints against Hovanec to her employer, resulting in her termination in May 2015, and to send the alisontheloser email to Hovanec's mother. For damages, Plaintiff alleges that she spent at least 150 hours trying to investigate Miller's violations (at a rate of $25 per hour), and that she is entitled to her lost income from her termination from W by Worth ("well in excess of $50000.00 per year"), expert costs in excess of $5,000 and accumulating at the rate of $275 per hour, and attorney's fees in excess of $5000 in both 2016 and 2017. Second Am. Compl. ¶ 57. Thus, although Plaintiff did not provide damages information in her Initial Disclosures or any supplemental disclosures, some information was detailed in the Complaint. However, Miller's attorney was unable to explore any of these alleged damages due to Hovanec's improper invocation of attorney-client privilege during her deposition. Thus, the parties should be prepared to discuss at the hearing whether any damages evidence specific to the CFAA claim must be excluded from consideration in any motion or trial.

## II. Whether there is some evidence that Miller created the alisontheloser@gmail.com account and accessed Hovanec's iCloud account?

Miller moves for summary judgment on the basis that there is no evidence that Miller created the alisontheloser@gmail.com account and sent the emails to Hovanec and Hovanec's mother and that there is no evidence that Miller accessed Hovanec's iCloud account. Miller points to Hovanec's deposition testimony where Hovanec stated that she did not have a theory about how

Miller accessed her iCloud account because "I don't know how she could have done this." Hovanec depo. at 65.

Hovanec testified that she logged into her iCloud account in 2015 using Miller's computer, which could have cached her login information, and Miller then could have used that to log into Hovanec's iCloud account. When asked, "So were you aware that she [Hovanec] had made use of your computer to access her e-mail account?" Miller responded, "I suppose, yes." Miller depo. at 79. Hovanec testified that she did not use the account for a period starting in 2015 and continuing through October 2016 and thus would not have known if someone was accessing the account. Miller contends that Hovanec did not attempt to confirm this belief by propounding a subpoena to Apple seeking information regarding the IP address of the user who accessed the iCloud account.[18] Further, Miller asserts that Hovanec's experts did not determine how Miller allegedly accessed the iCloud account, and expert Scott Broderhausen agreed that he could not identify a particular person behind the alisontheloser@gmail.com account based on the available information. Miller contends that the Google subpoena response supports her position that she did not create the email address, but it simply contains no information about the user IP data of

---

[18] In response, Hovanec has provided the Legal Process Guidelines for Apple, Inc. as of September 29, 2015, which state that iCloud subscriber information and connection logs with IP addresses can be obtained with a subpoena or greater legal process, and "[c]onnection logs are retained up to 30 days." Docket no. 77 Ex. M. Hovanec did not discover evidence indicating unauthorized access to her iCloud account until October 2016, well more than 30 days after the events of May 2016. Thus, Hovanec asserts that a subpoena to Apple would not have included connection logs with IP addresses during the relevant time frame. Miller has objected to the Legal Process Guidelines as unauthenticated and containing hearsay. Docket no. 80 at 5 ¶ 9. Hovanec responds that it can be authenticated and presented in admissible form, and was offered simply to rebut Miller's conclusory assertion that Hovanec should have attempted to confirm that Miller accessed the iCloud account by propounding a subpoena to Apple. The Court need not rule on the objection because it is unnecessary to resolve the motion for summary judgment, as it pertains only to what evidence not obtained might or might not have shown, rather than whether the evidence that has been obtained and provided raises a material fact issue.

the user of alisontheloser@gmail.com. Miller also notes that the IP address captured by Sauceda was not obtained from the offensive emails themselves, but from statcounter, but Miller has not shown the statcounter information to be unreliable or inaccurate.

Miller asserts that "[t]he allegation that Miller accessed the iCloud account is conclusional and nothing has been produced to show any evidence in support of Hovanec's theory." Docket no. 75 at 14. However, Plaintiff has provided sufficient evidence to raise a material issue of fact as to whether Miller was the user who created alisontheloser@gmail.com and whether Miller accessed Plaintiff's iCloud account. The fact that the evidence is circumstantial does not make it conclusory. As noted, Hovanec asserts that Miller could have gained login information to her iCloud account after Hovanec used Miller's computer to access the account. Further, Hovanec offers the following evidence:

● Miller knew of the alisonluevano@me.com email account because she sent Hovanec an email inviting her to the movie in the park on May 13, 2016. Miller depo. at 155.

● On May 16 and 17, Miller's IP address (confirmed by AT&T subpoena response[19]) was revealed as the same IP address of the user of the alisontheloser@gmail.com when the user clicked on the greenpowur.com link sent by Joel Saucedo that included the statcounter code to capture IP addresses. In addition, other information revealed by the statcounter code for Traci

_____

[19] Miller testified at her deposition that after receiving a letter from Plaintiff's attorney, she called AT&T and asked what her IP address was, and was told it was a different IP address than asserted in the letter. Miller depo. at 148. She then had an attorney friend send a response letter denying that the IP address 106.65.34.232 belonged to her. *Id.* at 148-150. However, the subpoena to AT&T confirmed that the address did belong to her at the relevant time (January 1, 2016 to June 30, 2016) and Miller's own expert McWorther has agreed that the IP address was associated with Miller. Although Miller asserts as relevant in her motion the fact that the IP address was not captured from the emails themselves but from the statcounter program, Hovanec correctly notes that Miller has not shown the statcounter tool to be inaccurate or unreliable, as the IP address it captured for Miller has been confirmed, and all experts agree that an IP address can be captured from a webpage visit, as Sauceda did in this case.

Miller and the user of alisontheloser@gmail.com was the same (*e.g.*, Mac OS X operating system).[20]

● Miller called Hovanec's father on May 17 and left a voice mail message. Miller testified that she obtained the phone number by looking it up online. Miller depo. at 136. But Hovanec states in her Affidavit that her father's phone number was not listed online, and that her father's information was in the stored contacts on her iCloud. Hovanec Aff. ¶ 46.[21]

● A contact for Julissa Albanese was stored in Hovanec's iCloud contacts. On April 14, 2017, Albanese received a Facetime call from 210-332-7331, an unrecognized number, and when she answered she saw a bald man wearing glasses sitting next to a young girl. The call lasted 35 seconds. Albanese received two additional calls that were hang ups. Because the calls alarmed her, Albanese used a reverse look-up app installed on her phone and it came back as Traci Miller. Albanese recognized Miller's name and immediately contacted Hovanec because she was concerned as to how Miller had her number and why this man was Facetiming her. After describing the man and child, Hovanec concluded it was Jason Miller, Traci Miller's husband. Albanese provided the screen shot of the calls and the reverse look-up to Hovanec. Hovanec contends that Jason Miller accidentally Facetimed Albanese using Traci Miller's

---

[20] Although the GUIDs were different, this is merely some evidence that the two webpage views were from different devices, which is some evidence that that the two users were different people using different devices or the same user using different devices or, as Broderhausen asserts, simply different GUIDs assigned by the statcounter program and thus do not necessarily reflect different devices. Thus, at this point in time, the significance of the different GUIDs is in dispute. Although Miller asserted that the GUID information was withheld until Sauceda's December 2018 deposition, Hovanec has provided evidence that the GUID information and the login information for the statcounter program was provided to Miller in discovery on July 7, 2018. Docket no. 82 Ex. N.

[21] Miller has objected to ¶ 46 as not based on evidence and exceeding Plaintiff's personal knowledge. But Plaintiff could have personal knowledge of whether her father's phone number was listed online and would know whether it was stored in her iCloud contacts.

device, and the only way Miller would have obtained Albanese's contact information was through Hovanec's iCloud contacts.[22]

● On October 16, 2016, Hovanec accessed her iCloud account to look for some photos and discovered evidence indicating that the user of alisontheloser@gmail.com had accessed her iCloud account.

Thus, there is some evidence (the IP address and other information captured by statcounter) that Miller was the creator and user of the alisontheloser@gmail.com account, and there is also some evidence that the user of the alisontheloser@gmail.com account accessed Hovanec's iCloud account on May 16 and May 17, 2016 to associate the email aliluevano@me.com with the alisontheloser@gmail.com account. Further, there is some evidence that Miller had access to contacts in Hovanec's iCloud account, specifically Hovanec's father and Julissa Albanese. The motion for summary judgment based on an alleged lack of evidence that Miller was behind alisontheloser@gmail.com and a lack of evidence of access to the iCloud account is denied.

---

[22] Hovanec supports this evidence with her own Affidavit and with the Affidavit of Julissa Albanese. Miller has objected to portions of Hovanec's Affidavit and has objected to Albanese's Affidavit and attachments "as an attempt to produce documents which have not been produced during the discovery period" and on the basis that conversations between Hovanec and Albanese are hearsay. Hovanec has personal knowledge and can testify to the fact that Julissa Albanese's contact information was stored in her iCloud account contact list. Hovanec Aff. ¶ 46.

Albanese has personal knowledge and can testify that she never exchanged contact information with Traci Miller, that she received the Facetime call from a bald man with a child, that she received two additional hang-up calls, and that she used the reverse look-up app and it displayed Traci Miller as the person with the phone number. If Albanese testifies at trial and describes the man and child, Hovanec can testify that it sounds like Jason Miller and the Millers' daughter, thus avoiding any hearsay concerns. As to Miller's assertion that none of the attachments were produced during discovery, Hovanec asserts that the reverse look-up app screen shot was produced in discovery on July 7, 2018 at HOV000164-165. However, it is unclear whether Albanese was ever identified as a person with knowledge or as a potential fact witness, and thus exclusion of her testimony may be an issue under Rule 37(c). With regard to evidence provided via Albanese's Affidavit that Jason Miller has tried to follow Albanese on Instagram, that is not relevant to the motion for summary judgment, and such evidence can be addressed via a motion in limine assuming that Albanese is not excluded as a potential witness.

### III.    Spoliation

Hovanec further asserts that Miller has failed to preserve relevant evidence and that she is therefore entitled to a spoliation remedy. Hovanec's attorney Rick Crowe sent two letters to Miller in May 2016 demanding that she preserve electronic evidence. Docket no. 77 Ex. K (May 17, 2016 letter); docket no. 77 Ex. L (May 23, 2016 letter). Miller admits receiving these letters and admits that she did not take any steps to preserve electronic evidence, did not preserve her May 2016 internet history or preserve text and email messages, and no longer has the AT&T wireless router, computer, or cell phone from the relevant time period. Hovanec contends that the Court should therefore apply a presumption that this evidence would have supported Plaintiff's claims that Miller created the alisontheloser@gmail.com account and accessed Plaintiff's iCloud account. Miller has not responded at all to Plaintiff's spoliation request.

The Court will set the spoliation request for a hearing.

### Conclusion

Miller's Motion for Summary Judgment (docket no. 75) is DENIED. However, if evidence is excluded pursuant to Rule 37(c), summary judgment may become appropriate as to some claims.

The Court sets a hearing on **August 14, 2019 at 10:30 a.m**., the time currently scheduled for the pretrial conference, to consider (1) whether Hovanec's damages evidence (or any other evidence) must be excluded from consideration pursuant to Rule 37(c)[23] and (2) whether Hovanec is entitled to a spoliation remedy. **No later than July 31**, the parties should provide

---

[23] No later than July 31, should Miller seek to have the Court impose any other Rule 37(c) sanctions pursuant to the second clause of Rule 37(c), Miller must so move.

briefing on the applicable factors for the Rule 37(c) exclusion sanction and the spoliation remedy (*see* FED. R. CIV. P. 37(e)).

The Court VACATES the current deadline for filing the Joint Pretrial Order and the trial setting of August 19, 2019 pending resolution of the exclusion and spoliation issues.

In addition, at the hearing, the parties should be prepared to discuss whether they remain amenable to mediation, either through a private mediator or a Magistrate Judge. *See* docket no. 46 (ADR report agreeing that mediation would be appropriate after discovery and that the parties expected to confer on a mediator).

It is so ORDERED.

SIGNED this 22nd day of July, 2019.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE